IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br><br><br>vs.<br><br><br>ARTHUR HATATHLE,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS<br><br><br><br><br>Case No. 2:07-CR-814 TS |

## I.  INTRODUCTION

Defendant moves to suppress allegedly statements made to an FBI agent on the grounds that he was not given a *Miranda* warning[1] and because his statements were not voluntary.  The government argues no *Miranda* warning was required because Defendant was not in custody when he made the statements and his statements were voluntary.  The Court finds Defendant was not in custody, his statements were voluntary, and denies the Motion to Suppress.

---

[1]*Miranda v. Arizona*, 384 U.S. 436 (1966).

1

## II.  FINDINGS OF FACT

For the purposes of this Motion, the Court finds as follows.  Defendant lives on the Navajo Nation Indian Reservation and works as a school bus driver. On the afternoon of October 26, 2007, Special Agent Larson of the Federal Bureau of Investigation (FBI) drove out to Defendant's residence to investigate a claim that Defendant had inappropriately touched a passenger on the school bus.  The Agent was dressed in slacks and an untucked button-down shirt.

Agent Larson parked his car in front of Defendant's residence, next to Defendant's vehicle.  As Agent Larson approached the house, Defendant came out of the house and up to the front gate to speak with the Agent.  Agent Larson introduced himself, identified himself as an FBI agent, and asked if Defendant would speak with him.  Defendant did not invite the Agent into his yard, where there were barking dogs, or into his home.  Agent Larson was recording the interview.  He asked if Defendant would be willing to talk for a minute and asked if he wanted to sit in the Agent's car away from the barking dogs.

Defendant agreed to speak with the Agent in his vehicle.  Defendant walked over to the Agent's vehicle, opened the passenger side door, and sat on the passenger side seat and closed the door.  Agent Larson opened the driver side door and sat in the driver's seat.  The Agent did not pat-down the Defendant. The Agent's vehicle remained parked in front of Defendant's house and unlocked throughout the interview.  The windows were rolled up throughout the interview.

Once inside the car, Agent Larson expressed appreciation to Defendant for "coming out to talk to me," introduced himself again as an FBI agent, and asked Defendant if he

knew why the Agent was there.  Defendant responded that he guessed he knew, but said

he remained puzzled.   The Agent explained he was there to investigate the matter

forwarded from the School District.

> So I'm here, I'm here, I'm here to do the investigation, talk to you, try to get
> everything straightened out and get things going on an even keel again,
> okay?  So I'd just like to record a statement with you real quickly.  Find out
> what your perspective is.  What your side of the story is.  That sort of thing.
> Okay? You be willing to talk to me for a couple of minutes?[2]

Defendant responded, "yeah"[3] and asked the Agent if he had received a copy of the

letter sent to Defendant by the School Board.  The Agent responded that he had not

received a copy of the letter.

The Agent told Defendant that what he was investigating was not a very serious

crime compared to other types of crime investigated by the FBI.  The Agent told Defendant

he wanted to be sure this type of incident was not going to happen again.  Defendant said

the letter did not specify the child involved, but that he thought it was the alleged victim.

The Agent let Defendant tell his version of the alleged incident with few interruptions

except to ask a brief clarifying question or say "uh, huh."   Defendant explained that the

alleged victim had taken his cell phone and he had to search the alleged victim's pockets

and clothing to find it.  When Defendant finished his explanation, the Agent told him,

falsely, that they had a test in the form of a light that would glow to show exactly where

---

[2]Ex. 2, at 3.

[3]*Id.*

3

Defendant had touched the alleged victim's clothing.  The Agent then questioned Defendant regarding exactly where Defendant had touched the alleged victim.

The Agent told the Defendant, again, that the matter "was not that serious," but could get serious if Defendant did not tell the truth.  He also asked if Defendant would apologize to the child's family, but told him he must apologize for what really happened. The Agent then told Defendant that he thought the Defendant had made up the story about the cell phone to excuse his actions and again reiterated that Defendant should tell what really happened.   Thereafter, the Agent and Defendant talked for a while with the Agent reiterating that Defendant should tell the truth, that the incident was not that serious, and that the test would reveal the truth anyway.

As the interview progressed, the Agent believed that Defendant was changing his answers about where he had touched the alleged victim.  The Agent several times told Defendant that he did not believe the cell phone explanation or it was a lie, that the Agent thought Defendant felt bad about what he had done, and had made up a story involving the cell phone as a cover up, and that what Defendant did was "not that serious, but it has to stop."  The Agent told him counseling was available and that "nobody else has to know about it."[4]

Defendant explained that he was worried about his retirement.  The Agent again stated that he thought Defendant needed therapy, but first had to tell what had happened. Defendant asked where and how he would get therapy.  The Agent responded:

---

[4]Ex. 2, at 23.  *See also id*. 25 (telling Defendant he needed to admit his mistake and get some "therapy, some counseling, on a private, quiet basis").

We can talk about that later but first you gotta be willing to talk about what happened and tell the truth.  Don't worry about getting fired.  You're not going to get fired.[5]

Defendant asked if he told the truth about what happened if the Agent was going to "take him," meaning arrest him.  The Agent responded: "No.  I'm not gonna take you.  Whatever, whatever you tell me when we're done talking, I'm gonna go home and eat supper.  That's what I'm gonna do.  I'm not taking you anywhere."[6]  Defendant asked: "How 'bout I didn't do it then I say I did?"[7]  The Agent responded: "No.  I absolutely don't want that.  If you didn't do it, you don't tell anybody that you did.  Especially me.  Okay?  But, but I think you did."[8]

Defendant then said that he had not meant to touch the child, but that the "test" would show he had.  The Agent had Defendant make a drawing with shading to show the location where he had accidentally touched the child.  The Agent told Defendant that if a person touched a child inappropriately by accident, they didn't need help in the form of counseling or therapy, but that people who touched "on purpose" and then "feel bad about it" need some help.[9]  The Agent further said: "Not the people that do it on purpose and don't feel bad about it, I don't care about those guys.  Alright?  We just lock those guys up and we forget about them.  But, I think you're the kind of person that did it on purpose and

---

[5] *Id*. at 26.

[6] *Id*.

[7] *Id*.

[8] *Id.*

[9] *Id*. at 30.

feels bad about it."  Defendant responded: "I feel bad about it cuz it never happened to me like this ya know for a long time."[10]

The Agent responded to Defendant's remark by questioning him closely about other possible incidents.  Defendant responded that none of the other children would say anything happened to them over the years, but that he felt he had been stuck on the worst bus routes with difficult passengers.  Defendant indicated that he didn't want gossip.  The Agent responded: "Sure, well, nobody else needs to know that.  Uh, I'm not gonna tell anybody else."[11]

The Agent again reiterated that he believed the cell phone explanation was not truthful, and encouraged Defendant "to tell the truth" so the Agent would know it was not going to happen again.  The Agent told Defendant that he needed to accept responsibility for having touched the alleged victim inappropriately, knowing he should not have, and feeling bad about it.  This conversation followed:

Defendant:   So are they going, they gonna fire me or what?  What they gonna do?

Agent:   I don't know what they're gonna do over there [at the School District].

Defendant:   Or take me to jail?

Agent:   Well, I'm not gonna take you to jail.  Okay?  But I, I need to know what the truth is.  And I'm not gonna . . .

Defendant:   'Kay I think I did, but I wouldn't, I wasn't for . . . [12]

_____

[10]*Id.*

[11]*Id*. at 34.

[12]*Id*. at 34.

Defendant again stated the incident was based on his search for his cell phone. The Agent again opined that the cell phone explanation was an untruthful excuse and that Defendant should be truthful.

Agent:      That way I know that you're beginning the healing process and, and you can change and won't do it again.

Defendant:  And, and after that, what you gonna do?

Agent:      I'll forward all of the results of my investigation, uh, to the FBI.

Defendant:  And . . .

Agent:      And if they don't think it's very serious, then nothing will happen. If they think it is serious and you need help, they'll try to get you some help.

Defendant:  Take me to the jail?

Agent:      Maybe, maybe not.  But it's important that you be truthful about what happened.  Otherwise, you look like a liar trying to cover it up.

Defendant:  Okay.  Accidentally.[13]

* * *

Agent:      Okay.  Well, you know, you, you're asking me questions about whether or not you're gonna get fired and, and I think you're trying to decide, I better say accidentally so I don't go to jail and get fired. Okay.  But that's not what really happened.  It wasn't an accident. You know that.[14]

The Agent told Defendant twice that he thought Defendant had touched the alleged victim on purpose because he was a normal man who liked women.  The Agent had earlier

---

[13]*Id*. at 35.

[14]*Id*. at 36.

suggested that some children liked to be touched.[15]   Defendant admitted he had touched the alleged victim and indicated where.

The Agent and Defendant then moved on to more general conversation about military service, where Defendant went to school, his GED, his ability to read and write English "a little," his history as a bus driver, and his family.  During this part of the interview, Defendant's grandchildren began arriving home from school and going into Defendant's house.

The Agent then wound up the interview by telling Defendant that he appreciated him talking to him, and summed up that they would "go with" what Defendant had said but that the Agent still thought Defendant had made up the cell phone story to excuse his actions. The Agent also again encouraged Defendant again to tell the truth, face up to what happened, and make changes in his life.

Defendant asked the Agent if he wanted to see what Defendant had written about the incident.  The Agent responded he would like to see what Defendant had written, as well as the letter from the School Board, if Defendant wanted to bring it out.  The Agent turned off the recorder, they exited the Agent's car, and Defendant took the agent to Defendant's truck, where Defendant gave the Agent the statement he had written for the School Board and the letter.

While they were at Defendant's truck, Defendant allegedly told the Agent he had touched the alleged victim.  The Agent turned back on the recording and Defendant said

---

[15]*Id*. at 17.

he had touched the alleged victim "real fast."[16]   Defendant attempted to demonstrate what he meant by a fast touch on the Agent's body.  The Agent rebuffed the attempt with a joke that "you touch me there man, we're gonna fight, buddy . . . . "[17]

Defendant said the touching on the alleged victim had taken maybe a second and explained he had tried to tell what happened in the statement he had written.  Defendant questioned whether the Agent thought his statement was important, the Agent replied it was, and took a copy.  The Agent turned off the recording, returned to his vehicle, and left.

The entire conversation between the Agent and Defendant from their first encounter at the gate to the final turning off the recording was slightly less than an hour.  The recording was turned off for about three minutes while Defendant took the Agent to show him the papers in Defendant's truck.

Throughout the encounter, the Agent and Defendant used a conversational tone. Neither party raised their voice.  Both remained calm.  Defendant did not appear to be emotional, but was nervous.  The Agent did not display the weapon he wore concealed beneath his shirt.  Defendant was never restrained in any manner. The Agent never touched or made physical contact with Defendant.  No other  enforcement agents were present or nearby during the interview.

The interview was conducted in English.  Navajo is Defendant's first language and he speaks English with an accent.  The tape and transcript of the interview reveals that

---

[16]*Id*. at 49.

[17]*Id.* at 50.

Defendant's English was adequate to understand the conversation, to ask questions, understand the answers, and to intelligently respond to the Agent's questions.

After the interview was concluded the second time, the Agent left, leaving Defendant to go about his business.

The Agent did not inform Defendant of his rights, expressly tell him that he did not have to answer questions, or expressly tell him he was free to leave.

### III.  DISCUSSION AND CONCLUSIONS

Defendant argues the statements should be suppressed because it was a custodial interview and he was not given an advice of rights. In support, Defendant argues the evidence establishes the following:  the interrogation was conducted in a law enforcement dominated environment where a reasonable person would not have felt free to leave; Defendant was not informed he did not have to answer questions or that he could leave at any time; Defendant was subjected to prolonged accusatory questioning that was specific to the allegations against him; and Defendant was separated from his home and family and placed in a police dominated atmosphere.

Defendant also argues that his statements should be suppressed because they were not voluntary because they were made as a result of coercive promises of leniency. Finally, Defendant argues the statements were involuntary because they were obtained because the Agent took unfair advantage of Defendant's traits, such as his age, his cultural background, and his unfamiliarity with English.

The government contends that the evidence establishes that Defendant was not in custody and that his statements were voluntarily made.

A.      Custody

On its own terms, *Miranda* applies only to custodial interrogations. Thus, *Miranda* rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of interrogation.[18]

Courts emphasize that the determination of custody is "necessarily fact intensive," an objective determination made on the totality of the circumstances, considering "the encounter as a whole, rather than picking some facts and ignoring others."[19]

We therefore must determine whether 'a reasonable person in the suspect's position would have understood the situation as the functional equivalent of formal arrest.  A reasonable person does not have a guilty state of mind and does not have peculiar mental or emotional conditions that are not apparent to the questioning officer.[20]

We thus avoid hard line rules and instead allow several non-exhaustive factors to guide us. First, we consider "the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will."  Second, we look at "the nature of questioning," where "prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave."  Finally, by using the following helpful guideposts, we check whether police dominate the encounter:

[S]eparation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the

---

[18]*United States v. Jones*, 523 F.3d 1235, 1239-40 (10th Cir. 2008) (quoting *Miranda*, 384 U.S. at 444 and *United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008)) (internal quotation marks and brackets omitted).

[19]*Id.* at 1240.

[20]*Id.* (quoting *Chee*, 514 F.3d at 1112 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) and *United States v. Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000) (quotation marks and further citations omitted))).

subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.[21]

As an initial matter, the Court finds that the interview was an interrogation. "Interrogation is defined as words and actions that the police should know are 'reasonably likely to elicit an incriminating response.'"[22]  In the interview, the Agent sought Defendant's admission he inappropriately touched the alleged victim, an affirmative response to which would have been incriminating.

Defendant argues the interrogation was conducted in a law enforcement dominated environment where a reasonable person would not have felt free to leave because he was not informed of his right to leave or of his right to refrain from answering questions.

Defendant relies on the *United States v. Chee*,[23] another case involving Agent Larson and *United States v. Griffin*.[24]   In *Chee*, Agent Larson asked Chee to come to police station, separated him from his wife, told Chee he was not under arrest, was not in any trouble, could leave if he wanted, did not have to talk, and then interviewed him for about an hour.  The Tenth Circuit affirmed the trial court's finding that the defendant was

---

[21]*Id*. at 1240 (quoting *United States v. Griffin,* 7 F.3d 1512,1518-19 (10th Cir. 1993)).

[22]*Griffin*, 7 F.3d at 1518 n.6 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

[23]*Chee*, 514 F.3d at 1112-13.

[24]7 F.3d 1512.

not in custody for *Miranda* purposes because a reasonable person in Chee's position would not have believed "he was effectively under arrest."[25]

In *Griffin*, an airport case, police officers removed the defendant and her friend from an airplane they had just boarded, taken to large public room for a search, then was separated from her friend by a second officer who took her to a small police-controlled area of the airport.  In that small area there was no exit except around the police and she was not told she could refuse to answer questions, terminate the questioning, or leave the small room.[26]   In *Griffin*, the Tenth Circuit found it was not dispositive that the defendant had voluntarily consented to accompany the second officer and to answer questions.[27]  Instead, the Tenth Circuit found defendant was in custody after the second officer took her to the smaller police-restricted room because that is what a person in her position would have reasonably believed.[28]

In the present case, Defendant argues that because the Agent did not expressly tell him he was not under arrest or free to leave, that this case is more like the interrogation held to be custodial in *Griffin* than the non-custodial interrogation in *Chee*.  In support Defendant argues there was prolonged accusatory questioning, that the Agent lied about the availability of a test to show where Defendant touched the alleged victim, downplayed

---

[25]*Chee,* 514 F.3d at 1114.

[26]*Griffin*, 7 F.3d at 1515, 1517-19.

[27]*Id.*

[28]*Id*. at 1519.

the seriousness of the alleged incident, and was separated from his home and family, and placed in a police dominated atmosphere.

The government contends this case is like *Chee* in the following ways: the interrogation was an hour; Defendant was not restrained; Defendant was told he was not under arrest; the Agent mislead Defendant about the availability of scientific evidence; and Defendant freely left after the interview.

Tenth Circuit case law "establishe[s] the importance of telling suspects they are not under arrest and can terminate the encounter at will."[29]   It is undisputed that the Agent did not tell Defendant he was free to leave.  However, it is also undisputed that the Agent told Defendant several times that he was not going to arrest him, thus making it clear to Defendant that he was not under arrest and would not be arrested by the Agent that day no matter what his answers were.

This is a closer case than either *Chee* or *United States v. Jones*,[30] a case where an officer asked a defendant to enter his car to answer questions.  It is closer because in those cases the officers told the defendants they did not have to answer questions.  Nonetheless, on the totality of the circumstances, the Court finds the interview was not custodial.

The Court finds Defendant understood the interview was voluntary.  Defendant was not separated from his family and his home by the Agent.  Instead, it was Defendant who

---

[29]*Jones*, 523 at 1240.

[30]523 F.3d 1235 (10th Cir. 2008).

14

came out of his house alone to meet the Agent at the front gate.[31]  The Agent twice asked

his permission to speak with him and Defendant twice agreed.  The Agent did not order

Defendant into his vehicle, but instead, as in *Jones*, politely invited Defendant to speak in

his vehicle.[32]  This case is also similar to *Jones* in that the circumstances for inviting

Defendant into the vehicle–the barking dogs, the wind, and there apparently being no other

nearby location for an interview—do not support a finding of custody.[33]

The atmosphere in the Agent's vehicle was not police-dominated. The tone

remained conversational.  There were no other law enforcement persons present or

nearby. The Agent did not pat-down Defendant.  Defendant walked to the vehicle, opened

the door and entered without the Agent controlling the passenger side door.  The vehicle

remained unlocked and parked in front of Defendant's house next to his own vehicle. The

Agent sat next to him and did not control Defendant's exit door.  The Agent made no

physical contact, did not display a weapon, and did not raise his voice or threaten

Defendant.

The location of the interview in the Agent's official vehicle is "not dispositive of the

custody issue" "so long as his freedom was not curtailed to a degree similar to arrest."[34]

---

[31]The record does not reveal if there were any family members home at the time Defendant came out to meet the Agent at the front gate.

[32]*Jones*, 523 F.3d at 1242.

[33]*Id*. at 1242-43 (finding a respect for the defendant's privacy was a circumstance surrounding the officers' polite request to speak with Defendant in his vehicle that did not support a finding of custody).

[34]*Id*. at 1242 (quoting *United States v. Lamy*, 521 F.3d 1257, 1263 (10th Cir. 2008)).

After the interview had concluded, and the Agent had summed up his understanding of the situation and turned off the recorder, it was the Defendant who voluntarily prolonged the interview for the purpose of taking the Agent over to Defendant's truck to view the statement Defendant had prepared for the School Board.   After the interview, the Defendant was free to go about his business.[35]

The Agent's questioning of Defendant was accusatory and fact specific, but it was not threatening, or prolonged.  Some of the interview time was spent on Defendant's side of the story, some trying to pin down the exact circumstances of the incident, including a drawing, some of it on small talk, and some of the time was spent answering Defendant's questions and looking at the documents he volunteered.  The Agent repeatedly stated he did not believe the Defendant's explanation, but also repeatedly told him to tell the truth. On the totality of the circumstances in this case, the interview in this case of approximately an hour was not so prolonged and accusatory as to "create a coercive environment from which an individual would not feel free to leave."[36]

The Court finds that a reasonable person in the Defendant's position would not have understood the situation as the functional equivalent of formal arrest.  Therefore, the Court finds Defendant was not in custody at the time of the statements and no *Miranda* warning was required.

---

[35] *See id*. at 1243 (finding the fact that Defendant freely left after the encounter "as strong evidence that the interrogation was not custodial") (quoting 2 Wayne R. LaFave et al., Criminal Procedure (3d ed. 2007)).

[36] *Id*. at 1239 (quoting *Griffin*, 7 F.3d at 1518).

B.      Voluntariness

Defendant also contends that his statements were not voluntary.

The Government bears the burden of showing, by a preponderance of the evidence, that a confession is voluntary.  The question this court must resolve is whether "the confession [is] the product of an essentially free and unconstrained choice by its maker?

                                        *  *  *

This court determines the voluntariness of a confession based upon the totality of the circumstances, considering "both the characteristics of the accused and the details of the interrogation." "No single factor is determinative."[37]

                                        *  *  *

Relevant circumstances embrace both the characteristics of the accused and the details of the interrogation.  Such factors include (1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment.[38]

In determining voluntariness, the Court may first examine "the details of the interrogation, before considering [the Defendant's] personal characteristics, because his personal characteristics 'are relevant only if this court first concludes that the officers' conduct was coercive.'"[39]

---

[37]*United States v. Lopez*,  437 F.3d 1059, 1063 (10th Cir.  2006) (quoting *United States v. Lugo*, 170 F.3d 996, 1004 (10th Cir. 1999) and *United States v. Toles*, 297 F.3d 959, 965-66 (10th Cir. 2002) (other citations omitted)).

[38]*Id*. at 1063-64 (quoting *Toles*, 297 F.3d at 965-66) (further citations omitted)).

[39]*Id*. at 1064 (quoting *United States v. Erving L.*, 147 F.3d 1240, 1249 (10th Cir. 1998)).

For the reasons stated above, the Court finds that the circumstances of the interrogation were not coercive.

In addition to those factors, Defendant also argues that the statements were not voluntary because the Agent used a promise of leniency to elicit the statements. Defendant relies on *United States v. Lopez.*[40]  In *Lopez*, the officer wrote slips of paper as a visual to show Defendant that if he confessed to killing as a mistake, that he would receive 6 years instead of 60 years.  The officer also said others had received lenient sentences after confessing to accidental killings.  In *Lopez*, the Tenth Circuit affirmed the trial court's finding that this was not the type of permissible vague and non-committal promise but was an actual promise that the defendant would spend fifty-four fewer years in prison if he would confess to killing a person by mistake.[41]  The Tenth Circuit held that the "nature of [such] a promise may indeed critically impair a defendant's capacity for self-determination" and found the confession to be involuntary.[42]

"[A] promise of leniency is relevant to determining whether a confession was involuntary and, depending on the totality of the circumstances, may render a confession coerced."[43]

---

[40]437 F.3d 1059, 1064 (10th Cir. 2006).

[41]*Id.* at 1064-65

[42]*Id.*

[43]*Clanton v. Cooper,* 129 F.3d 1147, 1159 (10th Cir. 1997) (finding law clearly established for § 1983 purposes).

Defendant argues that he was told he would not be fired and would just receive counseling if he confessed.  The Court finds that the Agent did not make impermissible promises of leniency such that would overbear Defendant's will. The initial vague remark about not worrying about getting fired is ambiguous as to whether it relates to being fired for admitting the need for counseling.  The Agent's repeated remarks about the availability of counseling were clarified in response to Defendant's direct question on whether he would be fired if he said he did it: the Agent responded unambiguously that the Agent didn't know.  As to whether he would go to jail or just get help, the Agent made it clear that while he was not arresting Defendant that day, he also told Defendant that the resolution might or might not involve going to jail.

Coercion by promises of leniency is a close call in the present case because of the Agent's continual remarks about counseling and his early remark that Defendant shouldn't worry about being fired.   However, the Agent subsequently clarified for Defendant that the Agent did not know what the School Board would do and that Defendant might or might not go to jail after the FBI considered the case.  These clarifications were made before the alleged confessions to an accidental touch and to a fast touch.  In view of the subsequent clarification, the Court finds that the suggestions of leniency in this case were not actual promises of leniency of the type that could overbear Defendant's self determination.[44]

Defendant also argues that the statements were not voluntary because of the exaggerated evidence—the Agent's false statement regarding a glowing light test that

---

[44]*Lopez,* at 1065 (citing *United States v. Lewis*, 24 F.3d 79, 82 (10th Cir. 1994)).

would show exactly where he had touched.  In *Lopez*, the officer's misrepresentation of the evidence was found to have acted in conjunction with an actual promise of leniency sufficiently to have made the Defendant's statement involuntary.[45]

However, *Lopez* also noted that the general rule was "it is well-settled that a confession is not considered coerced merely because the police misrepresented to a suspect the strength of the evidence against him."[46]  Thus, a false statement that the police had evidence against the Defendant "without more, does not render an otherwise voluntary confession involuntary."[47]

Finally, Defendant argues that his confession was involuntary because the Agent used Defendant's personal characteristics of age, education, and intelligence to obtain a confession.  The Court having determined that the Agent's conduct was not coercive, Defendant's personal characteristics are not relevant.[48]

---

[45] *Id*.

[46] *Id*. (quoting *Clanton*, 129 F.3d at 1158 (holding in § 1983 case that promises of leniency coupled with misrepresentation of evidence could render confession coerced)).

[47] *Lucero v. Kerby*, 133 F.3d 1299, 1311 (10th Cir. 1998) (habeas case citing *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992) for proposition that "of the numerous varieties of police trickery . . . a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary.").

[48] *Lopez*, 437 F.3d at 1063.

IV.  ORDER

Based on the foregoing, it is

ORDERED that Defendant's Motion to Suppress (Docket No. 51) is DENIED.  It is further

ORDERED that the time from the filing of the Motion to Suppress through the date of the new trial setting is excluded from the computation of Speedy Trial Act time pursuant to 18 U.S.C. § 3161(h)(1)(F) and (J).  Trial will be re-set by separate notice.

DATED   October 16, 2008.

BY THE COURT:

_____
TED STEWART
United States District Judge